BASICOMPUTER CORPORATION,
Plaintiff,

v.

Frank SCOTT, et al., Defendants.

No. 91 CV 2178.

United States District Court,
N.D. Ohio, E.D.

Dec. 26, 1991.

Richard S. Mitchell, Steven J. Miller, Robert A. Goodman, Daniel D. Domozick, Goodman, Weiss & Freedman, Cleveland, Ohio, for plaintiff.

Carter R. Dodge, Keith A. Savidge, Seeley, Savidge & Aussem, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAM H. BELL, District Judge.

### INTRODUCTION

Currently before the court is plaintiff Basicomputer Corporation's motion for pre-

liminary injunction. In its motion, plaintiff seeks an order enforcing covenants not to compete, and other contractual provisions which restrict the defendants' removal, retention or misuse of confidential business information. Following this court's issuance of a stipulated temporary restraining order on the 30th of October, 1991, a two day hearing was held on November 8 and 12, 1991, during which the parties submitted evidence and testimony in support of their respective positions. The following order is the product of that hearing.

## I. FINDINGS OF FACT

1. Basicomputer Corporation [hereinafter "Basic"] is an Akron, Ohio based corporation which integrates microcomputer products and services for sale to corporate and government accounts in the Midwest, Dallas, and, particularly, from a White Plains, New York office which it purchased as a going concern from two of the defendants.

2. As a matter of course, Basic requires all employees to sign an employment agreement which contain covenants not to compete and which restrict the disclosure or removal of confidential business information or trade secrets.

3. Prior to Basic's White Plains purchase, defendants James Noble, Thomas Schlotter, and Susan Westburg, then employees of the office Basic was on the verge of purchasing, attended an employment orientation meeting in Akron, Ohio at which time they were informed of the terms of employment with Basic, including covenants not to compete.

4. On August 22, 1989, Basic purchased its White Plains, New York office as a going concern through an asset purchase of Scott Electronics (which did business as a DOS computer center) from its majority shareholders, defendants Frank Scott and Lydia Prokop. The purchase price was approximately $2,000,000.00.

5. On the date of sale, August 22, 1989, defendants Scott and Prokop signed employment contracts with Basic containing covenants not to compete and other restrictive covenants. On that same day, defendants Noble, Schlotter and Westburg effec-

tively began their employment with Basicomputer.

6. On the first of September, 1989, defendants Schlotter, Noble and Westburg signed employment agreements with Basicomputer because they were told they would not be paid unless they signed these documents.

7. Apart from establishing various terms of employment, all the defendants' employment contracts contained identical restrictive covenants which provided for the following:

4. Employee acknowledges and agrees that his employment under this Agreement necessarily involves his/her understanding of an access to certain trade secrets and confidential information pertaining to the business of the Corporation. Accordingly, Employee agrees that at all times after the date hereof, Employee shall not at any time or in any manner divulge, disclose or communicate to any person, firm or corporation in any manner whatsoever any proprietary information, confidential information or trade secrets concerning or relating to the business of the Corporation, including without limiting the generality of the foregoing, the identity of any of its customers, the prices at which the Corporation sells or has sold its products and services, or any other information concerning the business of the Corporation. Employee shall not remove or retain, except in the normal conduct of his duties under this Agreement, any figures, calculations, letters, papers, documents, instruments, drawings, designs, or copies thereof, or any other confidential information of any type or description. Any breach of the terms of this Paragraph 4 shall be deemed to be a material breach of this Agreement.

5. Employee shall not during his/her employment accept employment or receive any compensation of any kind whatsoever from any of the Corpora-

tion's prospects, customers, suppliers, competitors, or their agents, representatives, etc., nor for a period of one (1) year thereafter sell or work with anyone who sells microcomputer equipment, software, accessories, etc., within fifty (50) miles of any of the Corporation's stores or sales offices or work for or with any of the Corporation's suppliers. For purposes of this Paragraph 5, a "customer" shall mean a person or entity who has purchased at least $100.00 worth of products from the corporation, and a "prospect" shall mean a person or entity who has been solicited for the purchase of at least $100.00 worth of products from the Corporation.

8. In addition to the above language and after discussion among the parties, a rider was appended to the contracts of defendants Schlotter, Noble and Westburg to allay their concerns over the noncompetition clause. This rider provided as follows:

Employee acknowledges that prior to the commencement of his employment with the Corporation, Employee was given a copy of the foregoing Employment Agreement and understood that Employee's entry into said Employment Agreement was a condition of Employee's employment with the Corporation. Employee and the Corporation acknowledge and agree that, pursuant to the request of the Employee, the Corporation has agreed to modify the provisions of Paragraph 5 of the Employment Agreement as follows:

In the event that Employee's employment with the Corporation shall terminate on or before November 19, 1989, the provisions of Paragraph 5 shall not thereafter apply to Employee.

The parties further acknowledge and agree that the foregoing modification shall not in any manner be construed to limit the application or operation of, or otherwise modify, any other provisions of the Employment Agreement, including, without limitation, the confidentiality undertakings made in Paragraph 4, and that the Employment Agreement, as modified hereby, shall be effective as of the commencement of Employee's employment with the Corporation.

9. The defendants, Frank Scott, Lydia Prokop, James Noble, Thomas Schlotter and Susan Westburg, all parties to the non-competition and confidentiality covenants above, were all employees of Basic's White Plains, New York office.

10. The defendants accounted for 50 to 60% of Basic's New York area sales. Tr. at 138.

11. The computer re-selling business provided each of the defendants with a lucrative income which is well above the national average.

12. Basicomputer's White Plains, New York office services a geographic area covering Connecticut west of Hartford, metropolitan New York, including Manhattan, and northern New Jersey. Tr. at 199.

13. In late summer and early fall of 1991, all the defendants voluntarily ended their employment relationship with Basicomputer.

14. All defendants are now employed at Sears Business Center in Norwalk, Connecticut; Sears Norwalk is a direct competitor of Basicomputer's White Plains, New York office, servicing a portion of Basic's sales area, Fairfield County, Connecticut. TR. at 30.

15. Sear's Norwalk office is well within a 50 mile radius of Basic's White Plains office.

16. Sears' Norwalk location is new, opening after Sears closed its White Plains, New York office.

17. Computer resellers such as Sears and Basic deal with very narrow profit margins.

18. Scott, as Sear's marketing manager, is head of the Norwalk, Connecticut office. Prokop is immediately subordinate to Scott. Defendants Schlotter, Noble and Westburg are subordinates of Prokop. Tr. at 72. This arrangement roughly parallels Basic's management structure at its White Plains office.

19. Since the defendant's departure, Basic's White Plains sales have declined by roughly $500,000 per month. Tr. at 134.

20. Prokop left Basicomputer on the 30th of August, 1991 taking with her commission statements, profit and loss statements for Basicomputer's White Plains office, daytimers (daily calendars), and a filing cabinet which, unknown to Prokop, contained her most recent proposal to one client. Transcript at 24, 25, 26

21. Prokop has had contact with her former clients while at Sears and has solicited at least three former Basic client's business, successfully obtaining a sale to one client. Tr. at 28, 29.

22. Prokop is currently marketing manager for Sears, which involves limited client contact and the development of new accounts as well as review of Sears' sales representative's job performance. Tr. at 371.

23. Schlotter has contacted several former Basic clients while at Sears.

24. Schlotter took with him his rolodex, copies of sales order made while at Basic. These sales order contained the customer name, a 'ship to' name, a Basicomputer configuration number, a date, line item prices, quantity, the markup percentages and the tax. Information which would be valuable to competitors. Tr. at 58.

25. Schlotter left Basic on September 16, 1991.

26. Scott voluntarily resigned his position with Basic on August 30, 1991.

27. Scott took with him business cards, his rolodex, daytimers, and and a document identifying new target accounts for Basic.

28. Noble left Basic on September 30, 1991, Tr. at 95. Taking with him commission statements and a business diary containing names and telephone numbers of Basic clients. Tr. at 109.

29. Noble has since solicited former Basic clients for Sears, and has made sales to at least one former Basic client. Tr. at 109.

30. Westburg informed her former Basic clients by mail that she was now at Sears. She has made sales calls upon these clients,

and has sold product to them in the amount of some 12,000.00. Tr. at 164–71.

31. Westburg has been working in the computer industry for 10 years. Tr. at 243.

32. Westburg left Basicomputer on August 9, 1991 taking with her copies of invoices and sales orders, monthly commission statements, appointment book and business card directory.

33. Basic attempted to keep its profit margin confidential by marking at least some commission statements as such, and by its employment agreements, which all employees must sign. Tr. at 189.

34. Most commission statements taken by the defendants are stamped "confidential" and all reveal the cost to Basic of the equipment it purchases, the amount it was sold for, and the profit derived from this sale.

35. It takes an average of six months to secure business from a Fortune 500 company. Tr. at 212.

36. Client information remains valuable for one year. Tr. at 201.

## II. ANALYSIS AND CONCLUSIONS OF LAW

The contracts at issue provide that Ohio law will govern issues involving the validity and interpretation of the agreements. Thus, substantive law of Ohio will be applied in this case, as well as the applicable Sixth Circuit standards regarding preliminary injunctions.

■ The defendants assert that the forum selection clauses found in the employment contracts at issue divest this court of jurisdiction. These clauses, in part, read as follows:

[A]ctions brought arising out of or based in whole or in part upon this Agreement shall be brought *in courts in the State of Ohio and the parties consent to jurisdiction thereof.*

The plain language of this clause clearly contemplates the exercise of jurisdiction by this court. Simply put, this court is a court "in the state of Ohio". The clause at issue here differs materially from that in *Spatz*

*v. Nascone,* where the clause provided for the resolution of dispute "in the courts *of* the Commonwealth of Pennsylvania". 364 F.Supp. 967 (W.D.Pa.1973). Because the clause at issue in this case lacks the possessive preposition "of", defendants' reliance upon *Spatz* and analogous case law is misplaced.

■ The defense also contends that the forum selection clause is unenforceable because the contract was signed in circumstances indicating fraud, undue influence or overweening bargaining power. Evidently, this contention rests upon Basic's statements that it would not pay defendants Westburg, Noble and Schlotter unless they signed their employment agreements. Under the circumstances presented to this court, one cannot objectively conclude that this constituted undue influence. These defendants were aware of the contracts' provisions before they accepted employment with the plaintiff. The rider to the contract provided to each of these defendants would have permitted them to sign the agreement, and leave of their own free will within three months without being subject to the no-compete clause, which forms the foundation of this suit. Essentially, even though it did not have to do so, Basicomputer provided these defendants with an additional three months employment during which these defendants could have freely sought a position with a competitor.

### A. Preliminary Injunction Standard

■ The plaintiff has moved for a preliminary injunction regarding the covenants not to compete. Before a preliminary injunction can be issued, the following four factors must be considered:

1. Whether a movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm third parties.

4. Whether the public interest would be served by issuing the preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977); *accord, Gaston Drugs, Inc. v. Metropolitan Life Insurance Co.,* 823 F.2d 984, 988 (6th Cir.1987); *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cor.1985); *Federal Savings & Loan Insurance Corp. v. Quinn,* 711 F.Supp. 366, 376 (N.D.Ohio 1989), *vacated on other grounds,* 922 F.2d 1251 (6th Cir.1991). Further, "these factors are not to be rigidly required but rather, balanced according to their relative strengths." *Quinn,* 711 F.Supp. at 376. That is, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motors Co.,* 755 F.2d 1223, 1229 (6th Cir.1985); *accord Frisch's Restaurant,* 759 F.2d at 1263. However, even though the court must engage in this balancing test, "a plaintiff must *always* demonstrate some irreparable injury before a preliminary injunction may issue." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982); *see also Cripps v. Seneca County Bd. of Elections,* 629 F.Supp. 1335, 1340 (N.D.Ohio 1985). Finally, "district courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor,* 836 F.2d 566, 575-76 (D.C.Cir.1987). With these standards in mind, this court must determine whether plaintiff has demonstrated a need for a preliminary injunction.

### B. Likelihood of Success on the Merits

Of course, the plaintiff would not be entitled to succeed on their claims if this court lacked subject matter jurisdiction. Likewise, because the plaintiff's motion pertains to the defendants' breach of contract, the validity of these contracts is essential to any success on the merits. The defense has contested both the existence of the requisite amount in controversy and the legitimacy of the disputed employment contracts' provisions. Accordingly, this court shall first address these preliminary matters.

**1286**

### i. Subject Matter Jurisdiction

] As noted above, the defendants have controverted the presence of jurisdictional amount. To justify dismissal, it "must appear to a legal certainty that the claim is really for less than the jurisdictional amount...." *Saint Paul Mercury Indemnity Co. v. Red Cab. Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). In actions for injunctive relief, the amount in controversy is equivalent to "the value to plaintiff of conducting his business or personal affairs free from the activity sought to be enjoined...." C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3708 at 143–44 (2d.ed. 1985); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1976) (citing Wright, Miller & Cooper). Essentially, this asks the court to compare the value of the business not subject to competition from each defendant, and its value subject to competition from each defendant. *E.g. Zep Mfg. Corp. v. Haber*, 202 F.Supp. 847 (D.Tex.1962); *Burndy Corp. v. Cahill*, 196 F.Supp. 619, 622 (D.Minn.1961) (vacated on other grounds, 301 F.2d 448 (8th Cir.1962)).

In such an examination, "potential as a well as past damages" are appropriate for consideration. *Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730, 733 (8th Cir. 1965) *cert. denied*, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966). "Thus, in a suit brought by an employer against a former employee to enforce a covenant not to compete, the court usually will look to the profits earned by the employer on business generated by the employee during the period immediately preceding his termination." C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3708 at 149 (2d.ed. 1985); *Premier Indus. Corp. v. Texas Indus. Fastener Co.*, 450 F.2d 444 (5th Cir. 1971); *Zep Mfg. Corp. v. Haber*, 202 F.Supp. 847, 848–48 (D.Tex.1962) (holding that because the profits the plaintiff derived from the defendant's sales were less than the amount in controversy then required, jurisdiction did not lie). Courts have also considered the value of the plaintiff's lost revenue, the value of the future effect of a defendant's breach upon all of the plaintiff's other contracts with its sales agents, and the value of trade secrets and confidential information acquired by the defendants during their employment. *Premier Indus. Corp. v. Texas Indus. Fastener Co.*, 450 F.2d 444, 447 (5th Cir.1971); *Spraymation, Inc. v. Vidmer*, No. 85 C 4592, slip op. at 2, 1985 WL 2070 (N.D.Ill. July 31, 1985).

In the case at bar, Basicomputer's commission statements reveal that in 1990 and 1991, each individual defendant generated profits for the plaintiff that approach, if not exceed $50,000. *See, e.g.*, Prokop Exhibit 11 (Basicomputer's April 1990 profits from sales by Scott and Prokop were $11,358.92 and $67,851.59 respectively). This evidence, when considered with other factors, such as the value of lost revenue, which is estimated by the plaintiff's CEO at $500,000 per month, prevents this court from fairly concluding to a "legal certainty" that the value of the object of the litigation is less than $50,000 for each defendant. *See Spraymation, Inc. v. Vidmer*, No. 85 C 4592, slip op. at 2, 1985 WL 2070 (N.D.Ill. July 31, 1985).

### ii. Validity of the Contract

Obviously, for the plaintiff to establish a strong likelihood of success on the merits, the contract itself must be valid. To this end, the defense contends that defendants Noble, Schlotter and Westburg's employment contracts are invalid for want of consideration to support their promises not to compete. As noted above, the parties' testimony and the record establishes the following:

1) These defendants became aware of the covenant not to compete on August 14, 15, and 16, 1989 when they attended Basicomputer's orientation meeting.

2) They began working for Basicomputer on the 22d of August, 1989. Tr. at 219.

3) On September 1, 1989 they signed their employment contracts, including the covenant not to compete, after successfully obtaining the rider which allowed them to opt out of the covenant if they resigned their positions before November 19, 1989. The defendants were

told they would not be paid unless they signed this agreement.

4) In addition to the non-competition covenant, the contract established the defendants pay-scale, and provided:

> Either Employee or the Corporation may terminate the employment under this agreement on two (2) weeks notice. In the event, however, of misconduct, dishonesty or a material breach of this Agreement by Employee, the Corporation may terminate such employment without notice, and without prejudice to whatever other rights it may then have in relation to such misconduct....

■ Although the Ohio Supreme Court has not ruled on the issue, it appears to be settled law in Ohio that a promise of continued employment, standing alone, does not provide consideration for a promise not to compete. *E.g., Prinz Office Equipment Co. v. Pesko,* 1990 WL 7996, 1990 Ohio App. LEXIS 367 (1990); *Cohen & Co. v. Messina,* 24 Ohio App.3d 22, 25, 492 N.E.2d 867 (1985) *citing Morgan Lumber Sales Co. v. Toth,* 41 Ohio Misc. 17, 19, 321 N.E.2d 907 (C.P.1974). But, the Ohio Supreme Court has conclusively stated that the signing of an employment agreement containing such a covenant after the commencement of employment does not, standing alone, invalidate the contract. *Rogers v. Runfola & Associates, Inc.,* 57 Ohio St.3d 5, 6, 565 N.E.2d 540 (1991) *reh. denied,* 57 Ohio St.3d 725, 568 N.E.2d 1230 (1991). *Rogers* dealt with a covenant not to compete signed by the employee after she had begun working for the plaintiff. Implicit in the Court's reasoning is the proposition that a promise not to compete must be supported by consideration beyond a mere promise by the employer of continued employment. *See also Apronstrings, Inc. v. Tomaric,* No. 11–272, slip op. at 2, 1987 WL 15445 (Lake App. Aug. 7, 1987) ("Since agreements of this nature are frequently the result of unequal bargaining power some consideration, beyond a mere promise of continued employment must be provided by an employer."); *Prinz Office Equipment Co. v. Pesko,* 1990 WL 7996, *4 1990 Ohio App. LEXIS 367, *9 (9th App.Dist.

January 31, 1990). In *Rogers,* the Supreme Court's entire analysis was limited to the following:

> [the defendant] signed the contract with [plaintiff] promising she would not compete, and in return the [plaintiff] promised he would not discharge the [defendant] except for specified reasons. [Defendant] testified that at the time of signing the contract she read it and intended to live up to her promise. Thus considering the exchanges of mutually beneficial promises and the clear understanding between the parties, it is obvious to us that the employment contract of [defendant] contained sufficient consideration.

57 Ohio St.3d at 6, 565 N.E.2d 540. Thus, it is plain that a promise of no discharge but for cause provides consideration for a promise not to compete.

■ In the instant case, the contract at issue likewise contains sufficient consideration to support the defendants' restrictive covenants. Apart from establishing the defendants' compensation, the contract provided for a two week notice for at-will termination or resignation, and permitted the defendants to resign their positions, free of their covenants not to compete, for nearly three months following the date of contract. The defendants received these contractual rights in exchange for signing the employment contract with its restrictive covenants. Ohio courts have held that benefits such as these provide valid additional consideration sufficient to support covenants not to compete signed following the commencement of employment. *See Reynolds & Associates, Inc. v. Feeks,* 1991 WL 16040, *2, 1991 Ohio App. LEXIS 451, *3 (1st App.Dist.1991) ("Under Ohio law [defendant] began his employment as an employee at will. [Plaintiffs] forbearance from terminating [defendant], its agreement not to terminate him in the future unless upon thirty days notice, as well as its agreement to the remaining terms of the contract, including guaranteed monthly draw was sufficient detriment to constitute consideration for the contract."); *Toledo Clutch & Brake Service, Inc v. Childers,*

No. L–85–069 slip op., 1986 WL 2683 (Lucas App. Feb. 28, 1986) (employer's promise to pay employee seventy five percent of his salary upon termination if he could not find a position in a new field provided sufficient consideration to support employee's covenant not to compete); *Credit Consultants, Inc. v. Gallagher*, 1991 WL 124357, *4, 1991 Ohio App. LEXIS 3063, *12 ("When [defendant] executed the contract in exchange for [plaintiff's] promise that [defendant] would become a month-to-month employee, [defendant] received a benefit that he was not previously entitled (sic) as an at-will employee, which provides consideration to support the contract."). Accordingly, the contracts at issue are valid.

### iii. Breach and Enforceability of the Restrictive Covenants

■■■■■ The defendants' breach of the restrictive covenant is obvious. Simply put, they are working for a direct competitor within 50 miles of the place of their former employment. Thus, plaintiffs are likely to succeed on the issue of this covenant's breach. However, because the motion pertains to non-competition covenants, it must be determined whether plaintiff has demonstrated a substantial likelihood of success on the merits on the issue of the covenant's validity and enforceability. This issue depends upon whether Basicomputer seeks to protect a legitimate business interest and, if so, whether the covenant is reasonable.[1] *See Briggs v. Butler*, 140 Ohio St. 499, 45 N.E.2d 757 (1942); *E.P.I. of Cleveland, Inc. v. Basler*, 12 Ohio App.2d 16, 230 N.E.2d 552 (Cuy.Cty.1967). Ohio courts have fashioned the following three-pronged test to determine a non-compete covenant's reasonableness:

A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is re-

quired for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.

*Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 26, 325 N.E.2d 544 (1975). However, even if this test leads to the conclusion of unreasonableness, the "restrictions upon an employee will be enforced to the extent necessary to to protect an employer's legitimate interests." *Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5, 8, 565 N.E.2d 540 (1991) (*quoting Raimonde* 42 Ohio St.2d at 21, 325 N.E.2d 544). To this end, courts are empowered to fashion reasonable covenants between the parties and, in doing so, may properly consider the following factors:

[t]he absence or presence of limitations as to time and space, ... whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d at 8, 325 N.E.2d 544 (*quoting Extine v. Williamson Midwest*, 176 Ohio St. 403, 406, 200 N.E.2d 297 (1964). When approaching such problems, "each case must be decided on its own facts." *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25, 325 N.E.2d 544 (1975).

---

1. It should be noted that the public and some courts continue to perceive covenants not to compete as suspicious in the eyes of the law. Nevertheless, an exhaustive review of contemporary case law on this subject reveals that while courts continue to express reservations regarding the validity of non-competition covenants, such reservations have little impact in practice. In fact, perhaps cognizant of this unintentional yet understandable paradox, the Ohio Supreme Court recently expressed that it is "entirely proper for a trial court to enjoin an employee who breached a covenant not to compete...." *Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5, 9, 565 N.E.2d 540 (1991).

■ This court is compelled to conclude that the covenant outlined above is necessary to protect Basic's legitimate business interests. It, is not questionable that employers such as Basic, who rely heavily upon active sales force and close client contact, have a genuine need to protect their goodwill from potentially voracious former employees. *See, e.g., Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757 (1942). With this established, the court must determine whether the covenant is greater than required to protect the employer, and whether it imposes undue hardship on the employees.[2]

The covenant at issue restricts, for the period of one year, the defendants' ability to "sell or work for or with anyone who sells microcomputer equipment, software, accessories, etc., within (50) miles of any of the Corporation's stores or sales offices *or* work for or with any of the Corporation's suppliers." (emphasis added). First, it should be obvious that the covenant's blanket ban on employment with any of the corporation's suppliers, which completely lacks any spatial restrictions, is patently unreasonable and should be stricken. In this case, however, we are confronted with defendants employed with a direct competitor in the microcomputer sales market. The one year temporal limitation is not greater than that necessary to protect Basic. Ohio courts frequently uphold similar restrictions. *See, e.g., Rogers v. Runfola & Associates, Inc.,* 57 Ohio St.3d 5, 565 N.E.2d 540 (1991); *Columbus Midway, Inc. v. Holtz,* 1988 WL 142304 (Ohio App. Licking Cty 1988). In fact, the Ohio Supreme Court in *Raimonde* approved a three year limitation on a veterinarian's practice. 42 Ohio St.2d at 28, 325 N.E.2d

544. In light of these cases, and the circumstances indicated in the hearing, one year's protection against the destruction of good will is not unreasonable. The same analysis hold true for the geographic restriction of fifty (50) miles. Ohio courts have also upheld similar agreements. *See, e.g., Economou v. Physicians Weight Loss Centers of America,* 756 F.Supp. 1024 (N.D.Ohio 1991). In the instant case, Basic's desire for such a restriction is particularly understandable in light of the large sales territory serviced by its White Plains office.[3] The covenant's restrictions are a reasonable means of protecting the employer's legitimate interests.

■ The final factor this court shall consider is whether the covenant will impose undue hardship upon the employees. In making this determination, this court is constrained to acknowledge that such a determination that a covenant is unduly harsh necessitates a higher threshold of privation than is required to find that a covenant is unfair. Unduly harsh requires excessive severity:

> To be sure, any person who is prevented from practicing his profession for a period of time in an area in which it has been practiced, suffers some hardship. However, the *Raimonde* test requires more than just some hardship.... Too often courts have attempted to rewrite contracts for parties that appear after the fact to be more equitable to one or more of the parties. The *Raimonde* opinion acknowledges that temptation and its test should therefore be strictly applied.

*Marietta Therapy v. Boles Associates, Inc.,* 1989 WL 159018, *3, 1989 Ohio App.

**2.** The public's interest in this litigation is dubious. Here, the court is faced with the compelling public interest in both free competition free of monopoly, and the equally compelling interest in maintaining high standards of commercial ethics. Accordingly, this court finds the covenant not injurious to the public.

**3.** Even if the 50 mile limitation was unreasonable, it would be difficult for this court to conceive of a *reasonable* modification which would not, and should not prevent the defendants' current employment. Were this court to half the limitation to 25 miles, the map submitted into

evidence suggests that the Sears' location in Norwalk would still fall within that restriction. That even an uncalled for modification of the restriction would still be applicable to the defendants is illustrative of the seriousness of their breach. The defendants, en masse, accepted employment with a direct competitor in close proximity to their former employer's location. That this same competitor had, until recently, operated a facility in same city as their former employer makes this observation even more compelling.

LEXIS 4919, *8 (4th App.Dist.1989) (*quoting Williams v. Hobbs,* 9 Ohio App.3d 331, 336, 460 N.E.2d 287 (1983) (Moyer, J., dissenting)). As noted above, covenants of this type, and some which were more severe have found favor with Ohio courts. As to defendants Scott and Prokop, the finding that the covenant is not unduly harsh is particularly conscionable. Their employment agreements, containing the restrictive covenants, were signed contemporaneously with the sale of their business to Basicomputer. As noted by the oft-cited hallmark Ohio case concerning non-competition covenants:

> A seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought.

*Arthur Murray Dance Studios of Cleveland v. Witter,* 62 Ohio Law Abs. 17, 45, 105 N.E.2d 685 (1952) (*cited with approval in Raimonde v. Van Vlerah,* 42 Ohio St.2d at 25, 325 N.E.2d 544; *OGIA/Rogers Agency, Inc. v. Estep,* 1990 WL 174100, 1990 Ohio App. LEXIS 4908 (10th App.Dist. 1990)). The hearing testimony supports such a view: "[t]hat's the reason we acquired DOS White Plains, because they had the customer base that I bought and paid good money for, and now they are trying to take it away." Brick testimony at 212.

The *Murray* court's discussion, although addressed to consideration of irreparable injury, is equally applicable to a determination of the severity of a covenant not to compete. With these standards in mind, this court can only find that the covenant at issue is in fact unduly harsh when applied to defendants Noble Schlotter and Westburg. As the *Arthur Murray* court noted:

> [D]ifferent considerations apply—there is more freedom of contract between seller and buyer than between employer and employee,—the latitude of permissible restraint is more limited between employer and employee, greater between buyer and seller.... The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of the employer. Moreover, an employee is not on the same plane with the seller of an established business.... Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training.

*Id.* This court can only note that the facts presented evidence the prospect of severe privation for defendants Schlotter, Noble and Westburg if the covenant's one year duration is applied to them. Each, despite his or her lack of higher education, has created lucrative careers in the computer re-selling field. To deprive these young defendants, and their families, of this necessary income in the depressed New York business climate for a period of one year would be unnecessarily harsh. Unlike Scott and Prokop, they did not receive impact lessening proceeds that the sale of the business to Basic provided. Because this covenant is unduly severe as applied to these defendants, it should be modified. Keeping in mind the severity of these defendants' breaches, and Basic's provision of a three month period after employment which would have permitted these defendants to opt out of the covenant, this court feels that modification to an equitable period is appropriate. The covenant restrained these employees from engaging in unfair competition for clients with whom they were Basic's primary contact. Bearing in mind these facts, this court feels that an appropriate durational limit on competition is six months. Such a time frame results from an equitable balancing of the needs of these defendants to earn an income, and

their former employer's need to reestablish firm ties with its clients. *See* Brick testimony at 212 ("Fortune 500 accounts, has (sic) taken on average six months to secure my business from.").

In sum, this court finds that plaintiff has shown a substantial likelihood of success on the merits as to both the validity of the covenants not to compete and the defendants' breach of those covenants. These covenants should, therefore, be enforced in full against defendants Scott and Prokop. Such enforcement should also apply to defendants Westburg, Schlotter and Noble, with the durational aspect of their covenants modified to six (6) months.

▮ In addition to the covenants not to compete, the employment agreements provided the following:

> [Employee may not] divulge ... to any person, firm, or corporation in any manner whatsoever any proprietary information, confidential information or trade secrets concerning or relating to the business of the Corporation, *including without limiting the generality of the foregoing, the identity of any of its customers, the prices at which the Corporation sells or has sold it products and services or any other information concerning the business of the corporation.* Employee shall *not retain, except in the normal conduct of his duties under this Agreement, any figures, calculations, letters, papers, documents, instruments, drawings, designs, or copies thereof, or any confidential information of any type or description.* Any breach of the terms of this Paragraph 4 shall be *deemed a material breach of this Agreement.*

(emphasis added). In addition to the above, rather straightforward definitions of material subject to this contractual provision, Ohio has statutorily defined "trade secret" as follows:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become of general public knowledge. [Such information] is presumed to be secret when the owner thereof takes measure designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes.

13 Ohio Rev.Code § 1333.51(A)(3). *See also* 13 Ohio Rev.Code § 1333.81.

In a case such as this, as noted by Judge Aldrich, "it is unnecessary to split hairs with respect to the meaning of 'trade secret' "; it is sufficient that the defendants violated the plain terms of the employment agreement for which they bargained. *Premix, Inc. v. Zappitelli*, 561 F.Supp. 269, 276–77. (N.D.Ohio 1983). It is clear that the defendants, by retaining commission statements which were identified as confidential, violated the terms of the restrictive covenant. These statements, containing client information and profit margins enjoyed by Basic, not only falls within the terms of the agreement, but also, because they are marked confidential, are entitled to a presumption that they are trade secrets under Ohio law. The same conclusion must be reached with regard to the other documents retained by the defendants. Rolodex cards, business cards, appointment books, new customer target lists, and sales orders all contain information which would be helpful to a competitor. Such information, by identifying Basic's customers, client contacts, and pricing information clearly contains information identified in the restrictive covenant. "Customer information and lists have traditionally been regarded as valuable property, even if a person who 'troubled to follow the salesman could compile a reasonably correct list of customers' ". *Premix, Inc. v. Zappitelli*, 561 F.Supp. at 269. (citing *Briggs v. Butler*, 140 Ohio St. 499, 509, 45 N.E.2d 757, 762 (1942)). Likewise, the defendants' assertion that they could recall, from memory, the names of their Basic customers is inapposite. *See Commonwealth Sanitation Co. of Cleveland, Inc. v. Commonwealth Pest Control Co.*, 20 Ohio Op.2d

462, 178 N.E.2d 518 (Ct.App.Cuy.Cty.1961) ("*In absence of a restrictive covenant or fraud*, customers of a former employer, the names of whom are in the memory of the former employee, may be solicited.") (emphasis added). With regard to this information, a recent federal case construing a similar restrictive covenant is instructive. *Robert Half International, Inc. v. Van Steenis*, 1991 WL 259411, 1991 U.S. Dist. LEXIS 14362 (E.D.Mich.1991). In *Van Steenis*, the defendant was employed by a firm which placed full-time and temporary employees. When the defendant left his employ, he took with him various documents. The court, construing a restrictive covenant similar to that in the case at bar, made the following conclusion:

> [Defendant] violated the terms of Paragraph 7 of the Employment Agreement to the extent that he did not return to the Plaintiff, upon termination of his employment, certain documents obtained by [defendant] during his employment with the Plaintiff, which contained the name, contract person, and address of certain of the Plaintiff's clients. Included among these documents are the two year's worth of engagement calendars, client' business cards, and interview notice forms.

*Id.* 1991 WL 259411 at *12, 1991 U.S. Dist. LEXIS 14362 at *33–34. In light of such authority, the evidence submitted at hearing compels this court to conclude that the plaintiff is likely to succeed on the confidential business information issue.

C. Irreparable Injury

 The Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), quoting *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at the later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.*, 415 U.S. at 90, 94 S.Ct. at 953 quoting *Virginia Petroleum Jobbers Assoc v. Fpf*, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (D.C.Cir.1958). In other words, a showing that money damages resulting from a successful trial will not adequately compensate the alleged harm is a showing that the harm is "irreparable". *Warner Amex Cable Communications, Inc. v. American Broadcasting Companies*, 499 F.Supp. 537, 547 (S.D.Ohio 1980).

> It has been well said that the legal remedy must not only be plain, speedy and adequate, but as adequate to meet the ends of justice as that which the restraining power of equity is competent to grant.

*Harris Stanley Coal & Land Co. v. Chesapeake & Ohio Ry. Co.*, 154 F.2d 450, 453 (6th Cir.1946), *cert. denied*, 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656. It has been held that "a damages remedy can be inadequate for any of four reasons." *Roland Machinery Company v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984). These four reasons are:

> (a) The damage award may come too late to save plaintiff's business....

> (b) The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy....

> (c) Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected....

> (d) The nature of plaintiff's loss may make damages very difficult to calculate.

*Id.*

The second and third reasons are clearly inapplicable to this case. As for the first, the evidence at trial indicates that plaintiff's White Plains office is suffering financial hardship. Nevertheless, it is far from clear whether they will be forced to cease

business operations. It is the fourth reason which is most compelling.

As has been noted, the purpose of these covenants is to protect against unfair competition, loss of goodwill and client confusion. The ephemeral nature of these interests hinders any attempt to estimate their value when lost. The evidence establishes that the defendants, in possession of confidential information, have contacted their former Basic clients and, in some instances, have successfully made sales to these customers on behalf of Sears. The departure of these defendants, who once accounted for half or more of Basic's White Plain's sales, coincided with a precipitous drop in Basic's sales. Calculating the effects of such repeated attempts to diminish a former employer's goodwill is "difficult, if not impossible, to determine monetarily." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991). Such a loss is indicative of irreparable injury. *Ferrero*, 923 F.2d at 1449 ("the loss of customers and goodwill is an 'irreparable' injury.") (*citing Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir.1981). *see also Economou v. Physicians Weight Loss Centers of America*, 756 F.Supp. 1024 (N.D.Ohio 1991). To this end, this court finds compelling the reasoning contained in a similar case:

> Former employees are privileged to leave their employers and fairly compete against them. This privilege does not extend to employees who violate their duty of loyalty to their employer by plotting an en masse resignation, without warning, which has the effect of eviscerating the work force and operation of the employer's office ...
>
> [Plaintiff] has demonstrated a strong probability of success on the merits of its claims. Absent injunctive relief, [Plaintiff] will suffer irreparable injury in the form of its inability to fairly compete with [defendant] because of misappropriation and continuing misuse of [Plaintiff's] confidential information by the defendants and because of the continuing injury to [Plaintiff's] business caused by the defendant's raid of its workforce and client base.

*Alexander & Alexander Benefits Services, Inc. v. Benefit Brokers & Consultants, Inc.*, 756 F.Supp. 1408, 1415–16 (D.Or. 1991).[4] *See also Penetone Corp. v. Palchem, Inc.*, 627 F.Supp. 997, 1007 (N.D.Ohio 1985) (Dowd, J.) ("The court also finds that the plaintiff will suffer irreparable injury if the requested preliminary injunctive relief is not granted. Evidence before the Court establishes that plaintiff's sales to LTV Steel constituted a large percentage of plaintiff's income in previous years and up to the last two months. Further, the evidence establishes that in the last two months, the plaintiff's sales to LTV have substantially declined."). In light of such precedent, this court is obliged to conclude that the plaintiff will suffer irreparable injury if the injunction is not granted.

A similar analysis and conclusion is required under Ohio case law:

> We disagree with the trial court's analysis and denial of a preliminary injunction. First, even if [plaintiff] could eventually use [defendant's] internal records and recover dollar for dollar everything it lost, this would not necessarily constitute an adequate remedy at law. Simply because [plaintiff] might be able to show how much money it lost by virtue of [defendant's] breach of her covenant not to compete does not necessarily mean that if it is awarded that amount it will be made whole.

---

**4.** Although unnecessary for the purposes of this opinion, it should be noted that some federal courts, relying upon state law, have essentially determined that the irreparable injury requirement in cases of this type is a virtual non-issue. *See e.g., Overholt Crop Insurance Service Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir.1991) "Irreparable harm 'can be inferred from a trial court's actual finding of a breach of a restrictive covenant by the defendant'". (*quoting Cherne*

*Indus., Inc. v. Grounds & Assocs.*, 278 N.W.2d 81, 91 (Minn.1979)). *Picker Int'l, Inc. v. Blanton*, 756 F.Supp. 971, 983 (N.D.Tex.1990) "'[W]here the uncontradicted evidence shows that a former employee is working for a direct competitor, no finding of irreparable injury is necessary to support a permanent injunction to protect trade secrets.'" (*quoting Williams v. Compressor Engineering Corp.*, 704 S.W.2d 469, 470 (Tex.App.1986)).

In non-competition cases the future effects of such a covenant's violation must be considered. More specifically will real or long term damage to plaintiff's goodwill or future income occur because of defendant's operation during the forbidden period? If so, an injunction is proper because an injunction is an appropriate remedy to prevent future injury.

*Globe Services, Inc. v. Palmer,* No. CA86–02–028, slip op., 1986 WL 8909 (12th App. Dist.1986). *See also Kaeser v. Adamson,* No. CA–800, slip op., 1984 WL 4491 (5th App.Dist.1984).

D. Injury to Others and the Public Interest

The remaining two factors under the preliminary injunction standard have little if any bearing on this case. There is no discernable injury to any third party which may result from the issuance of a preliminary injunction. Further, if the public has an interest in these issues, it is in seeing that reasonable non-compete covenants are preserved. As keenly observed by one court:

> [W]hen ... a choice must be made between the possible punitive operation of the writ and the failure to provide adequate protection of a recognized legal right, the latter course seems indicated and the undoubted tendency of the law has been to recognize and enforce higher standards of commercial morality in the business world.

*Picker Int'l, Inc. v. Blanton,* 756 F.Supp. 971, 983 (N.D.Tex.1990) (quoting *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958)).

## III. CONCLUSION

The defendants in this case have flagrantly violated the terms of their valid and enforceable restrictive covenants. The plaintiff, properly before this court, has shown both a strong probability of success on the merits and irreparable harm. For these reasons, the plaintiff's motion for preliminary injunction is GRANTED; with the restrictive covenants modified as indicated herein. This opinion is based upon those facts elicited during the hearing relating to injunctive relief only.

IT IS SO ORDERED.