CENTURY BUSINESS SERVICES, INC., et al., Appellees,

v.

URBAN, Appellant.

[Cite as *Century Business Servs., Inc. v. Urban*, 179 Ohio App.3d 111, 2008-Ohio-5744.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 90741.

Decided Nov. 6, 2008.

---

112

114

Ulmer & Berne L.L.P., Jeffrey S. Dunlap, and Adrienne L. Rapp, for appellees.

Jackson Lewis L.L.P., James M. Stone, and Nicole M. Monachino; and Collins & Scanlon, L.L.P., and Thomas J. Scanlon, for appellant.

---

BOYLE, M.J., Judge.

{¶ 1} At issue in this appeal is the freedom to contract and the enforceability of noncompetition and nonsolicitation agreements associated with the sale of a business. Significant to this analysis is whether these agreements, when they are entered into contemporaneously with the sale of a business, should be distinguished from ones that are entered into by employees as consideration for employment. The trial court declared that the restrictive covenants at issue in this case were reasonable and enforceable as modified. Because we hold that the agreements should be afforded less scrutiny, and we find no abuse of discretion in the trial court's decision, we affirm.

{¶ 2} In December 1998, after months of negotiation, plaintiff-appellee, Century Business Services, Inc. (n.k.a. CBIZ, Inc.), purchased McClain & Company, L.L.P. ("McClain"), a public accounting firm located in Miami, Florida.[1] The terms of the sale were set forth in an asset-purchase agreement. Defendant-appellant, William G. Urban II, had been employed at McClain since 1978 and had been a partner since 1985. Pursuant to an executive-employment agreement, entered into simultaneously with the sale, he became a director at CBIZ ATA, starting at an annual base salary of $127,500.

{¶ 3} As compensation for the sale of McClain's assets and goodwill, Urban immediately received $266,402 cash and 19,499 shares of CBIZ stock. He also received an "earn-out payment" of $133,210, as well as an "earn-out payment" of 8,665 shares of CBIZ stock, paid one year later in December 1999.

{¶ 4} The asset-purchase agreement and the executive-employment agreement (collectively, "agreements") contained noncompetition and nonsolicitation provisions. According to both agreements, Urban was prohibited from engaging in competition with CBIZ or soliciting CBIZ clients in any of the counties in the United States where CBIZ conducted business.

---

1. After the sale was complete, McClain became CBIZ Accounting, Tax and Advisory of South Florida ("CBIZ ATA"). Plaintiff-appellee, CBIZ ATA, is a subsidiary of CBIZ, Inc. For ease of readability, this court will refer to plaintiff-appellees, CBIZ, Inc. and CBIZ ATA, collectively as "CBIZ," unless we find it imperative to distinguish between the two.

{¶ 5} The noncompetition restriction in the asset-purchase agreement expired on December 1, 2003, and the nonsolicitation provision will expire on December 1, 2008. The noncompetition restriction in the executive-employment agreement will expire on October 15, 2011, and the nonsolicitation provision will expire on October 15, 2016.

{¶ 6} On October 15, 2006, Saul Reibstein, CBIZ's Eastern Region Managing Director, Financial Services, fired Urban.[2]

{¶ 7} After declining CBIZ's offer to "acquire" CBIZ clients, Urban informed Reibstein that he intended to work in public accounting in south Florida. The following day, CBIZ's attorney sent Urban a letter warning him that "[b]y performing any accounting services in Miami–Dade County," he would violate the noncompetition and nonsolicitation provisions of the agreements.

{¶ 8} In October 2006, CBIZ filed a complaint for preliminary and permanent injunctive relief and declaratory judgment against Urban. Urban answered and set forth counterclaims, seeking a declaratory judgment that the restrictive covenants were unenforceable.[3]

{¶ 9} The case proceeded to a two-day bench trial. After reviewing the evidence, the trial court found that CBIZ had met its burden of proof under *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, and declared that the restrictive covenants "may be lawfully enforced for the locations delineated by the Court."[4]

{¶ 10} It is from this judgment that Urban appeals, raising seven assignments of error for our review. We note at the outset that we agree with CBIZ that Urban's assignments of error all fall under the umbrella of his third assignment; i.e., whether the trial court erred "in failing to hold the noncompete and nonsolicitation covenants unenforceable" under *Raimonde*.[5] As CBIZ claims, Urban's other assignments "merely address certain factors" under the *Raimonde*

---

2. Urban was actually informed of his termination in August 2006, but he worked at CBIZ ATA through October 15, 2006. The parties agree that the circumstances surrounding Urban's termination are not relevant to this appeal.

3. CBIZ later dismissed the breach-of-contract claims against Urban, leaving competing declaratory-judgment actions between the parties.

4. The trial court limited the geographic area of the restrictive covenants to the 12 counties where CBIZ ATA customers were located (six in Florida, five in New York, and one in Ohio).

5. Urban does not dispute CBIZ's claim. In his brief, Urban does not even argue his assignments in the order he presents them. And in his reply brief, he states, "The legal question before this Court, which underlies all of Mr. Urban's Assignments of Error, is whether the non-compete and non-solicitation covenants are * * * legally enforceable" (which is exactly what he argues in his third assignment).

test.[6] Accordingly, for ease of understanding, this court will address Urban's assignments of error together.

### Declaratory–Judgment Standard

{¶ 11} In *Mid–Am. Fire & Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, the Ohio Supreme Court reaffirmed that " 'the granting or denying of declaratory relief is a matter for judicial discretion.' " Id. at ¶ 12, quoting *Bilyeu v. Motorists Mut. Ins. Co.* (1973), 36 Ohio St.2d 35, 37, 65 O.O.2d 179, 303 N.E.2d 871. Thus, this court will not reverse a trial court's decision granting declaratory judgment absent an abuse of discretion. *Mid–Am.*, paragraph two of the syllabus. An abuse of discretion connotes more than an error of judgment; it implies a decision that was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

### Restrictive Covenants

{¶ 12} In Ohio, noncompetition and nonsolicitation agreements that are reasonable are enforced, and those that are unreasonable are "enforced to the extent necessary to protect an employer's legitimate interests." *Raimonde*, 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, at paragraph one of the syllabus. In *Raimonde*, the Ohio Supreme Court held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." Id., paragraph two of the syllabus.

{¶ 13} In determining whether restrictive covenants should be enforced, the facts of each case are paramount. Id. at 26, 71 O.O.2d 12, 325 N.E.2d 544. The Supreme Court also made it clear that "[c]ourts are empowered to modify or amend employment agreements to achieve" a reasonable covenant between the parties. Id. In doing so, courts should consider the following factors:

{¶ 14} " '[T]he absence or presence of limitations as to time and space, *. * * whether the employee represents the sole contact with the customer;

---

6. His remaining assignments of error are that the trial court erred in enforcing the restrictive covenants because (1) he did not misuse confidential information (third *Raimonde* factor); (2) the covenants prevented ordinary competition (fourth *Raimonde* factor); (4) the duration of the covenants was too long (first *Raimonde* factor); (5) the covenants were beyond the scope reasonably necessary to protect CBIZ's legitimate business interests (*Raimonde* syllabus); (6) the harm to Urban was substantial, and CBIZ did not suffer any harm (sixth *Raimonde* factor); and (7) CBIZ's reason for enforcement, to deter other employees, was not a legitimate business interest (*Raimonde* syllabus).

whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.'" Id. at 25, 71 O.O.2d 12, 325 N.E.2d 544, quoting *Extine v. Williamson Midwest* (1964), 176 Ohio St. 403, 406, 27 O.O.2d 375, 200 N.E.2d 297.

{¶ 15} In *Basicomputer Corp. v. Scott* (N.D.Ohio 1991), 791 F.Supp. 1280, 1281, fn. 1, the court pointed out:

{¶ 16} "[T]he public and some courts continue to perceive covenants not to compete as suspicious in the eyes of the law. Nevertheless, an exhaustive review of contemporary case law on this subject reveals that while courts continue to express reservations regarding the validity of non-competition covenants, such reservations have little impact in practice. In fact, perhaps cognizant of this unintentional yet understandable paradox, the Ohio Supreme Court * * * expressed that it is 'entirely proper for a trial court to enjoin an employee who breached a covenant not to compete. * * *' *Rogers v. Runfola & Associates, Inc.*, 57 Ohio St.3d 5, 9, 565 N.E.2d 540 (1991)."

{¶ 17} Moreover, preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest. *UZ Engineered Prod. Co. v. Midwest Motor Supply Co., Inc.* (2001), 147 Ohio App.3d 382, 397, 770 N.E.2d 1068.

## Restrictive Covenants Ancillary To the Sale of a Business

{¶ 18} We agree with Urban that, generally, restrictive covenants in employment agreements have been disfavored by courts since such covenants are normally written by employers and are in restraint of trade and the right to livelihood. *Gen. Med., P.C. v. Manolache*, 8th Dist. No. 88809, 2007-Ohio-4169, 2007 WL 2325829, citing *Morgan Lumber Sales Co. v. Toth* (1974), 41 Ohio Misc. 17, 19, 321 N.E.2d 907. But this is not a typical employer-employee relationship. Here, in exchange for valuable consideration, Urban agreed to sell McClain to CBIZ. For the following reasons, we agree with CBIZ that restrictive covenants entered into ancillary to the sale of a business should be afforded less scrutiny than ones entered into by employees as consideration for employment.

{¶ 19} Indeed, "[t]he sale of a business's good will is the most entrenched of the exceptions to the general public policy against restraint of trade." McGrane,

Franklin v. Forever Venture, Inc.: Similar Business Defined in the Context of the Sale of Good Will. Exception to the South Dakota Public Policy Against Restraint of Trade (2006), 51 S.D.L.Rev. 507, 509.

{¶ 20} In *DiAngelo v. Pucci* (Mar. 31, 1987), 11th Dist. No. 1267, 1987 WL 8856, the parties executed a written contract in which appellants agreed to sell their business and its goodwill to appellee. As part of the agreement, appellants provided that they would not compete with any business of a similar nature within a ten-mile radius of Ashtabula for a period of 15 years. On appeal, the appellants challenged the 15 years as being unreasonable. The court upheld the limitation, however, pointing out that "time limitations of ten years have been found to be valid, as have limitations lasting as long as the buyer of a business remains in the city where the subject business was purchased." Id. at *2, citing 17 Ohio Jurisprudence 3d (1980) 561, Contracts, Section 119.

{¶ 21} In *DiAngelo*, the court reasoned that " '[w]hile the covenant by a seller of a business not to engage in the same business is void where the restraint is general, an agreement which imposes only a partial restraint made in connection with the sale of a business and its goodwill, shown to be reasonably necessary to the enjoyment of the good will and not oppressive, is valid and may be enforced. * * *' 17 Ohio Jurisprudence 3d (1980) 565–566, Contracts, Section 122."

{¶ 22} In *Basicomputer,* 791 F.Supp. 1280, 1281, the court explained that restrictive covenants are "particularly conscionable" when employment agreements containing the covenants were signed contemporaneously with the sale of a business. Id. at 1290. This is because " '[a] seller is usually paid an increased price for agreeing to a period of abstention. The abstention is part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought.' " Id., quoting *Arthur Murray Dance Studios of Cleveland v. Witter* (1952), 62 Ohio Law Abs. 17, 45, 105 N.E.2d 685.

{¶ 23} As the court stated in *Arthur Murray* :

{¶ 24} "[D]ifferent considerations apply—there is more freedom of contract between seller and buyer than between employer and employee—the latitude of permissible restraint is more limited between employer and employee, greater between seller and buyer. * * * The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of the employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business." Id. at 60–61.

{¶ 25} Thus, restrictive covenants entered into simultaneously with the sale of a business should be distinguished from such covenants that are entered into by an employer and employee, and should be enforced if they are reasonable under the *Raimonde* test.

{¶ 26} With this in mind, before we address Urban's arguments relating to the *Raimonde* factors, we must first consider a theme that he raised throughout trial, and in his brief to this court, because it affects every other issue he raises. Urban complains that CBIZ argued at trial that the restrictive covenants should be enforced "solely because CBIZ paid Mr. Urban money in exchange for signing the Asset Purchase Agreement." This fact, however, is critical and its importance cannot be overlooked by this court.

{¶ 27} Urban claims that "CBIZ has already received more than the benefit of its bargain from the 1998 acquisition" because he worked for CBIZ ATA "for nearly 8 years." But Urban's contention is flawed. Urban was not merely an employee hired randomly, with no bargaining power. He received nearly $500,000 in cash and stocks for the sale of his business. For his employment agreement, which was incorporated into the purchase agreement, he also received a starting salary of $127,000 in 1998 for working at CBIZ, which increased to $225,000 over his eight years of employment. Thus, this court cannot simply ignore the fact that the covenants were supported by valuable consideration.

{¶ 28} Another theme running throughout Urban's brief is that CBIZ unilaterally wrote the agreements and forced him to sign them. The evidence presented at trial, however, showed otherwise. Urban testified that he read the restrictive covenants and said that he had previously known about noncompetition clauses from his years in accounting. He admitted that he did not give them much thought, however, because he "believed" that "noncompetes [were] subject to interpretation."

{¶ 29} Although Urban discounts it, CBIZ presented evidence at trial showing that Urban, as part owner of McClain and Company, took part in the negotiations of the sale of the company and voiced his concerns about the sale. There was also evidence that Urban agreed to sign the agreements only after receiving more cash and stock than he was originally supposed to receive. The Schedule of Partners shows that, out of ten former McClain partners, Urban received more cash and stocks than all but three of them.

{¶ 30} Thus, when addressing issues raised by Urban, we must keep in mind that as a partner, he not only read the restrictive covenants and understood them, he voluntarily agreed to them after extensive negotiations in exchange for valuable consideration.

*Raimonde* Analysis

{¶ 31} The trial court found that under *Raimonde,* CBIZ met its burden of showing that the restrictive covenants were enforceable, as modified by the court with respect to the geographic coverage. Thus, the trial court, albeit implicitly, determined that the restrictive covenants met the three elements under *Raimonde* for enforceability, because they (1) were no greater than required for the protection of CBIZ's legitimate business interests, (2) did not impose an undue hardship on Urban, and (3) were not injurious to the public. *Raimonde,* 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544, paragraph two of the syllabus.

{¶ 32} Urban asserts otherwise, raising seven arguments, most of which address the factors set forth in *Raimonde.* He maintains that it was CBIZ's burden to *prove each Raimonde* factor before the restrictive covenants could be enforced. We disagree.

{¶ 33} In *Raimonde,* the Supreme Court set forth a test of reasonableness for courts to consider when determining whether a restrictive covenant should be enforced; the court stated, "Among the factors properly to be considered are," and it then listed the factors. Id. at 25, 71 O.O.2d 12, 325 N.E.2d 544. Thus, the court set forth a balancing test, not a rigid formula where each factor must be proven. Indeed, the court made clear that "each case must be decided on its own facts." Id.

1. Time and Space Limitations

{¶ 34} Urban concedes that CBIZ has a legitimate business interest. He also admits that the agreements were valid. He maintains, however, that the restrictive covenants within the agreements, even as modified by the court, were broader than reasonably necessary to protect CBIZ's legitimate business interests.

{¶ 35} The only remaining time limitation on competition will expire on October 15, 2011.[7] That is approximately three years from the date of this opinion. Urban will be able to practice public accounting at that time, just not solicit CBIZ clients for another five years. This should not be a hardship for Urban, since he maintained at trial, and throughout his brief, that he has not and

---

7. Urban argues that the noncompetition and nonsolicitation covenants were ambiguous because his "term" of employment under the executive-employment agreement expired two years after the commencement date, on December 1, 2000. However, Urban did not raise this argument at trial, and thus he cannot raise it for the first time here. *State ex rel. Quarto Mining Co. v. Foreman* (1997), 79 Ohio St.3d 78, 81, 679 N.E.2d 706 (arguments that are raised for the first time on appeal will not be considered by an appellate court).

does not want to solicit CBIZ clients. Thus, the trial court did not err when it found the duration of the restrictive covenants to be enforceable.

{¶ 36} Regarding the geographic restrictions, we do not find that they are overly broad as modified by the trial court.[8] CBIZ had argued that the restrictive area should include *any county* in the United States where CBIZ conducts business, but the trial court properly limited the scope to those counties where CBIZ ATA clients were located, which is where Urban practiced. Thus, we conclude that the trial court's modification was reasonable under *Raimonde*.

### 2. Confidential Information

{¶ 37} Urban maintains that the restrictive covenants should not be enforced because there was no evidence that he "misused or disclosed confidential information." He argues that based on "this reason alone," the trial court erred in enforcing the covenants. He cites *Facility Servs. & Sys. v. Vaiden*, 8th Dist. No. 86904, 2006-Ohio-2895, 2006 WL 1572236, in support, claiming that this court held that a noncompetition clause will only be enforced if the former employee actually misused or disclosed confidential information.

{¶ 38} We disagree that *Facility Servs.* stands for that proposition and find it to be factually distinguishable from the present case. In *Facility Servs.*, after balancing the *Raimonde* factors, this court determined that "[t]he restrictions are vast and far-reaching, and purport to bar employment in areas which were merely incidental to [the employer's] main line of work." *Facility Servs.* at ¶ 53. The covenants here do not seek to prohibit Urban from obtaining employment in areas that are "merely incidental" to CBIZ ATA's main line of work, but in its only line of work, namely, public accounting.

{¶ 39} At trial, CBIZ did not argue that Urban had misused confidential information regarding clients. But that is exactly what CBIZ, through its restrictive covenants, was trying to prevent. CBIZ submitted evidence showing that *after* Urban informed Reibstein that he did not want to acquire the clients he had served at CBIZ, Urban informed Reibstein via email that although he had not finalized any plans, his "intention [was] to work in public accounting for a local firm in Miami–Dade County."

{¶ 40} CBIZ also submitted email correspondence between Urban and Richard O'Brien, a firm administrator from Ribotsky, Levine & Company, CPAs. O'Brien had told Urban that he "was a very rare find on monster.com." He asked Urban if his salary requirement included consideration for a "book of

---

8. Urban does not argue that the trial court erred when it modified the geographic area. He maintains that there should be no geographical restrictions.

business" that he had independent of CBIZ. Urban replied that "[o]nce the dispute with CBIZ is resolved, [it] will be contingent upon whether or not I have access to my prior book of business. For 2006, my billings on my book of business were on pace to approximate $1.5 million, with approximately one-half being audit and one-half being tax." Thus, although Urban claims that he never intended to contact his former CBIZ clients, it is easy to infer from Urban's response to O'Brien that he had every intention of doing so.

{¶ 41} Accountants establish very personal relationships with their clients, ones that take years to develop and involve a deep level of trust. As such, it is highly likely that clients will follow their accountant to a new place of employment. Urban contends that his clients would not likely leave CBIZ because it had been over a year since he had serviced them, but that is not the issue. The issue is whether CBIZ has a legitimate business interest in ensuring that does not happen. And Urban concedes in his brief that it does.

{¶ 42} Moreover, CBIZ presented evidence at trial that it obtained new clients primarily through referrals. Stuart Block, Urban's former partner at McClain and a director at CBIZ ATA, testified that "[s]ome of the referrals come from our own existing clients because they like us. Many more referrals come from just our own network of business people in the community." Block agreed that Urban was a "rainmaker," and that "[h]e ha[d] a large network within the community and he does receive good referrals for business, both from the clients * * * and from the general people that know him in the community. So, he's created a lot of opportunities to solicit business."

{¶ 43} Block further testified that if Urban began working at another public accounting firm in Miami–Dade or Broward counties, "certainly the prospect that some of his clients that he previously serviced through our accounting firm would approach him about moving their accounting services to his new firm." Additionally, Block said that "various other nonclients of ours would hear about this, his referral sources would no doubt send business to his present firm."

{¶ 44} "An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers. * * * In addition, an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer." *UZ Engineered Prods.*, 147 Ohio App.3d at 396–397, 770 N.E.2d 1068.

{¶ 45} "Preventing a former employee from using his former employer's customer lists or contacts to solicit those customers is one of the traditional grounds for enforcing noncompete clauses." *Brentlinger Ents. v. Curran* (2001), 141 Ohio App.3d 640, 649, 752 N.E.2d 994, citing *Frank, Seringer & Chaney, Inc. v. Jesko* (Dec. 6, 1989), 9th Dist. No. 89CA004577, 1989 WL 147951.

{¶ 46} Thus, for Urban to suggest that because his clients were serviced by many CBIZ employees, his personal relationships were insignificant or trivial in some way, raises doubts as to his entire argument. Urban had over 350 clients at CBIZ with a client billing of $1.5 million. This court cannot conclude that his client relationships were inconsequential simply because other employees handled some of the services for his clients.

3.   Inherent Skills, Talents, and Experience of Employee

{¶ 47} Urban argues that the restrictive covenants are unreasonable because they prevent him from "utilizing the public accounting skills he gained in the 18 years before he worked at CBIZ ATA." It was partly those skills, however, that he gained in his 18 years at McClain, as well as the goodwill of his company—that enabled him to build up his client base during those years—which undoubtedly led CBIZ to seek to acquire McClain's assets in the first place.

{¶ 48} Again, any exclusion from public accounting arises from the fact that Urban, for good and valuable consideration, entered into a contract in which he voluntarily agreed not to compete and not to solicit for a particular duration and in particular areas. This is not the typical employer-employee relationship with unequal bargaining power.

{¶ 49} The restrictions do not prevent Urban from exercising his inherent skills outside the restricted area (although he argues against this in the following section). In addition, the restrictions do not prevent him from working in other areas of accounting, such as private accounting. Indeed, the evidence submitted at trial showed that Urban considered obtaining a position where he could utilize his inherent skills in private accounting (he posted his minimum salary requirements on job websites for private accounting positions).

4.   Benefit To Employer/Detriment To Employee

{¶ 50} Urban argues that he has suffered substantial hardship as a result of the trial court enforcing the restrictive covenants. But Urban himself stated in his brief that he had many years of experience, "not only perform[ing] public accounting functions," but in "supervising staff" and "high-level business consulting." And just a little over one month from his last day at CBIZ ATA, he obtained a position as CFO of a real-estate business, presumably based upon the

many skills he had, making an annual salary equal to what he made when he left CBIZ, $225,000.

{¶ 51} In addition, Urban contends that CBIZ, because it is such a large company in a highly competitive market, would not suffer any harm if the covenants were not enforced. We disagree.

{¶ 52} Urban submitted several documents into evidence showing the highly competitive public accounting market in south Florida. CBIZ does not dispute that the market is highly competitive but asserts that it is *because* the market is so competitive that courts uphold restrictive covenants in the first place. Under the facts of this case, we agree.

{¶ 53} As the court in *Basicomputer Corp.* stated, "To be sure, any person who is prevented from practicing his profession for a period of time in an area in which it has been practiced, suffers some hardship." 791 F.Supp. at 1290. But "[u]nduly harsh requires excessive severity." Id. We simply cannot conclude that in this case. Urban was able to obtain a position as a chief financial officer of a company approximately one month after leaving CBIZ—making a salary equal to that he made at CBIZ. Thus, we fail to see how this purported hardship was unduly harsh or excessive.

5. Ordinary Versus Unfair Competition

{¶ 54} Urban maintains that the covenants prevent him from engaging in ordinary competition, which is not a legitimate business interest. But again, Urban concedes in his brief that CBIZ's primary objectives in enforcing the restrictive covenants against Urban were legitimate business interests ("protect the company's relationships with the clients" and "preventing Mr. Urban from using its confidential information to entice current clients").

{¶ 55} In addition, Urban admitted to having a CBIZ client list. This fact assures that the competition would be anything but ordinary. See *Pratt v. Gunenwald & Compucardiology Inc.* (June 29, 1994), 2d Dist. No. 14160, 1994 WL 313050. The evidence shows that Urban desired to and planned to (before receiving the letter from CBIZ's attorney) contact his CBIZ clients and entice them to leave CBIZ. This amounts to unfair competition, which is exactly what CBIZ was trying to prevent through the restrictive covenants.

{¶ 56} Accordingly, the trial court did not abuse its discretion when it granted declaratory judgment for CBIZ, finding that the restrictive covenants were reasonable and enforceable as modified.

{¶ 57} Urban's seven assignments of error are without merit.

{¶ 58} The judgment of the Cuyahoga County Court of Common Pleas is affirmed.

Judgment affirmed.

CONWAY COONEY, P.J., concurs.

CALABRESE, J., dissents.

ANTHONY O. CALABRESE JR., Judge, dissenting.

{¶ 59} I respectfully dissent from the majority's opinion affirming the trial court's declaration that the restrictive covenants are reasonable and enforceable. Specifically, I take issue with whether the noncompetition and nonsolicitation provisions in this case are unduly restrictive based on their duration, the first factor under *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544. While I believe that five-year and ten-year time periods for these types of restrictive covenants are rare and rarely enforced, nonetheless I would hold that their enforcement commenced when the asset-purchase agreement was signed on December 1, 1998. Therefore, the noncompetition agreement expired in 2003 and is moot, and the nonsolicitation agreement expires in December 2008.