[Cite as *Clifton Steel Co. v. Trinity Equip. Co.*, 2018-Ohio-2186.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105675**

CLIFTON STEEL COMPANY

PLAINTIFF-APPELLEE

vs.

TRINITY EQUIPMENT COMPANY

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-16-862464

**BEFORE**:   Boyle, J., E.A. Gallagher, A.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   June 7, 2018

**ATTORNEYS FOR APPELLANT**

Scott J. Robinson
Aanchal Sharma
Gregory Thompson
Schneider Smeltz Spieth Bell, L.L.P.
1375 East Ninth Street, Suite 900
Cleveland, Ohio 44114


**ATTORNEY FOR APPELLEE**

Richard N. Selby
Dworken & Bernstein Co., L.P.A.
60 South Park Place
Painesville, Ohio 44077

MARY J. BOYLE, J.:

**{¶1}** Defendant-appellant, Trinity Equipment Company ("Trinity"), appeals the trial court's order granting plaintiff-appellee, Clifton Steel Company ("Clifton"), motion for preliminary injunction. Trinity raises the following assignments of error for our review:

1. The trial court erroneously interpreted the Agreement.

2. The trial court abused its discretion by finding, by clear and convincing evidence, that a preliminary injunction was warranted, thereby prohibiting Trinity from selling any product listed on Exhibit B to the Agreement to any entity identified on Exhibit A to the Agreement for one year after its termination.

3. The trial court erroneously denied Trinity's Motion to Dismiss Count I of Appellee's complaint pursuant to Civ.R. 12(B)(6).

**{¶2}** Finding no merit to Trinity's assignments of error, we affirm.

**Procedural History and Factual Background**

**{¶3}** Clifton is a steel manufacturer whose products include wear parts for the railroad industry. Railroad wear parts are replaced on a consistent basis "to protect wear within the [railroad] car itself." Trinity sells railroad parts and has acted as Clifton's sales agent since 1986. No written contract between the companies existed until May 4, 2012, when the parties entered into a Sales Agent Agreement ("the Agreement"). The Agreement provided that Clifton retained Trinity as its "authorized sales representative" for Clifton's railroad wear parts and set forth the terms of representation, compensation, and termination.

**{¶4}** Section 2 of the Agreement titled "Products and Customers," states that Clifton's "assigned customer base is defined as all companies listed on Exhibit A – Customer Listing." Section 2 defines Clifton's products as "listed on Exhibit B – Products Sold." Exhibit A lists approximately 380 "customers" and Exhibit B lists over 600 "products." Exhibits A and B are part of the record, although the parties dispute whether they were attached to the Agreement at the time of execution.

**{¶5}** As to termination, Section 5 of the Agreement, titled "Restriction on other representation during the term of this agreement and from competing on termination" states,

> During the term of the agreement, Trinity shall not directly or indirectly engage in any business or in the sale of any other products that are competitive with Clifton, unless otherwise agreed upon in writing by Clifton.
>
> * * *
>
> Trinity agrees that for a period of twelve (12) months immediately following the termination of their sales representation pursuant to this Agreement, whether such termination is at the instance of Clifton due to a breach of this Agreement by Trinity, or on Trinity's own initiative, or mutually agreed upon by the parties hereto, Trinity shall not either, either directly or indirectly, as an employee, agent, officer, director, or shareholder of a corporation, or a member of a partnership, joint venture or other entity, or in any other capacity, engage in the sale or solicit the sale of, either on its own account or on the account of another, the products and services of Clifton Steel Company to Clifton's customers, businesses, or users.

**{¶6}** Put simply, the latter part of Section 5 of the Agreement states that for one year after termination of the Agreement, Trinity "shall not * * * engage in the sale or solicit the sale of * * * the products and services of Clifton Steel Company to Clifton's customers * * * ('the Termination Provision')."

**{¶7}** The Agreement states that the Termination Provision "[s]hall not apply if Trinity terminates this Agreement due to a default by Clifton or if Clifton terminates this Agreement without cause."

**{¶8}** It is undisputed that on October 20, 2015, Trinity terminated the Agreement; however, the parties dispute whether Trinity terminated it for cause. Before one year had passed after the Agreement's termination, Trinity did business with 13 of Clifton's customers. As a result, on April 27, 2016, Clifton filed a complaint alleging two counts of breach of contract. Count 1 alleged that Trinity's business dealings with Clifton's customers violated the

Agreement's noncompete clause. Count 2 alleged that Trinity breached the Agreement by failing to pay invoices. Trinity moved to dismiss Count 1 of Clifton's complaint under Civ.R. 12(B)(6) arguing that the Termination Provision did not prohibit it from selling competitive products to Clifton's customers. The trial court denied Trinity's motion.

{¶9} Clifton also filed a motion for preliminary injunction. In its motion in opposition to Clifton's request for a preliminary injunction, Trinity argued that (1) the Agreement did not contain a noncompete clause, (2) even if the Termination Provision constituted a noncompete clause, it was not effective because Clifton defaulted by failing to perform its obligations under the Agreement, (3) the scope of the noncompete clause did not extend to all of the products and companies listed on Exhibits A and B because those exhibits were not attached to the Agreement at the time of execution, and (4) preliminary injunction was not warranted after an examination of the relevant factors. As to the language contained in the Termination Provision, Trinity argued that it is only prohibited from "becoming a secondary reseller of [Clifton's] products" for one year after the Agreement ended.

{¶10} In response, Clifton argued that the Termination Provision constitutes a noncompete clause and prohibits Trinity from selling "competitive products" for one year after the Agreement ended.

{¶11} On March 15, 2017, the court held a hearing on Clifton's motion for preliminary injunction. On March 22, 2017, the court issued an order granting Clifton's motion. In its order, the court stated,

> This Court finds that [Clifton] has proven all of the elements necessary for a preliminary injunction by clear and convincing evidence. * * * [T]his Court determined that the non-compete provisions of the Sales Agent Agreement between the parties should be interpreted so as to prohibit Defendant Trinity Equipment * * * from selling to or soliciting any of Plaintiff's customers

identified in Exhibit "A" to the Sales Agent Agreement with respect to any of the railroad wear parts identified in Exhibit "B" to the Sales Agent Agreement for a period of twelve (12) months following the termination of the Sales Agent Agreement.

\* \* \*

This Court further finds that [Trinity's] contention that it should be excused from these non-compete obligations because of some default on behalf of [Clifton] with respect to the Sales Agent Agreement is not well taken. This Court further finds by clear and convincing evidence that [Clifton] has demonstrated that it will suffer irreparable injury if the injunctive relief is not granted.

\* \* \*

This Court further finds that [Trinity] has not demonstrated that it will suffer any undue hardship as a result of the enforcement of this Agreement, and the public interest weighs in favor of enforcing contractual obligations between the parties.

{¶12} It is from this order that Trinity appeals.[1]

**Law and Analysis**

> ### A. Interpretation and Scope of the Agreement's Termination Provision

{¶13} In its first assignment of error, Trinity argues that the trial court erroneously interpreted the Agreement's Termination Provision as prohibiting it from selling competitive products, listed in Exhibit B, to Clifton's customers, listed in Exhibit A. Trinity also argues that the trial court erred when it rejected its argument that, because Clifton failed to perform its obligations under the Agreement, the Termination Provision does not apply.

{¶14} The parties agree that, according to the terms of the Agreement, Trinity was prohibited from selling "competitive products" while the Agreement was in force. The issue before us, however, concerns the language used in the Termination Provision, which prohibits

---

[1] The trial court granted Trinity's motion for stay of execution pending appeal. *See* journal entry dated April 28, 2017.

Trinity from selling "the products and services of Clifton Steel Company to Clifton's customers" for one year after termination of the Agreement.

{¶15} In its journal entry granting the injunction, the trial court found that

the non-compete provisions of the Sales Agent Agreement between the parties should be interpreted so as to prohibit Defendant Trinity Equipment from selling to or soliciting any of Plaintiff's customers identified in Exhibit "A" to the Sales Agent Agreement with respect to any of the railroad wear parts identified in Exhibit "B" to the Sales Agent Agreement for a period of twelve (12) months following the termination of the Sales Agent Agreement.

{¶16} On appeal, Trinity argues that the Termination Provision should be read literally, holding that upon termination of the Agreement Trinity was prohibited from selling products manufactured by Clifton. Clifton, on the other hand, argues that if taken literally, the provision would be meaningless because Trinity would no longer be selling Clifton products after termination of the Agreement. Clifton argues that the provision should be read broadly "to include products and services of the same type and nature that Clifton was selling, but that were manufactured by other companies." To support this argument, Clifton relies on Exhibits A and B, which it describes as follows: "Exhibit A defined the universe of customers that Trinity was attempting to sell to on Clifton's behalf and Exhibit B defined the types of Clifton Steel products Trinity was attempting to sell to those customers."

{¶17} Our standard of review regarding contracts follows:

The construction of a written contract is a matter of law that we review de novo. Our primary role is to ascertain and give effect to the intent of the parties. We presume that the intent of the parties to a contract is within the language used in the written instrument. If we are able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract.

(Citations omitted.) *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 201 N.E.2d 452, ¶ 9.

{¶18} "Contractual language is considered ambiguous where the meaning of the language cannot be determined from the four corners of the agreement, or where the language is susceptible to two or more reasonable interpretations." *Co. Wrench v. Andy's Empire Constr., Inc.*, 8th Dist. Cuyahoga No. 94959, 2010-Ohio-5790, ¶ 19. When ambiguity is found, courts interpret the parties' intent, and thus, the meaning of the contract based on extrinsic evidence. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987).

{¶19} Generally, in interpreting the parties' intent, contracts are to be construed against their drafters. Known as the doctrine of contra proferentum, this rule in construing contract terms against the drafter, however, "is a secondary rule of contract construction and is not applicable when a primary rule of contract construction clarifies the meaning of the contract." *Michael A. Gerard, Inc. v. Haffke*, 8th Dist. Cuyahoga No. 98488, 2013-Ohio-168, ¶ 14, citing *Malcuit v. Equity Oil & Gas Funds, Inc.*, 81 Ohio App.3d 236, 610 N.E.2d 1044 (9th Dist.1992). In fact, "Ohio courts have generally resolved contract ambiguities against the drafter only where parties lacked equal bargaining power to select contract language." *Id.*; *see also T.A.P. on Tap, Inc. v. Sardis*, 8th Dist. Cuyahoga No. 75755, 2000 Ohio App. LEXIS 2740, *13 (June 22, 2000) ("[T]he doctrine is applied only when the contract is deemed ambiguous and parol evidence has not revealed the parties' intent. * * * Where contract terms are ambiguous, *contra proferentum* is not preferred as a tool of interpretation although it is most appropriately utilized in situations where the parties did not have equal bargaining positions."). Here, the court held a hearing on Clifton's motion for preliminary injunction, at which the following evidence was presented regarding the meaning of the Agreement and, in particular, the terms used in the Termination Provision.

{¶20} John Thomas testified that he is the president of Clifton and has been since 2014. Thomas was not Clifton's president when the Agreement was drafted, although he is familiar with Trinity and the Agreement.

{¶21} Thomas described Exhibit A as "a customer base that Clifton Steel has been selling [railroad] parts to for a number of years." Thomas testified that Exhibit A listed approximately 383 business entities that Trinity and Clifton considered "customers" or "prospects." According to Thomas, a "prospect" is a "potential customer" or a "customer that you haven't done business with in a while."

{¶22} Thomas described Exhibit B as "a portfolio of products that * * * for the most part are sold throughout the history of our company into the railroad industry." According to Thomas, Clifton has been manufacturing railroad parts for over 45 years, and although Clifton does not actively sell all the parts on Exhibit B "at any one time, * * * a large portion of those have been sold over the years by Clifton Steel."

{¶23} Thomas stated that noncompete clauses are particularly important in the railroad wear parts industry because "it's an annuity and it's based on a relationship that once you have your foot in the door and they buy your product, they are more than likely to continue to buy your product." Thomas testified that "competitive products" means "something manufactured by a competitor." Thomas also testified that the words "competitor" or "competitive products" were not in the Termination Provision; however, according to Thomas, the Termination Provision meant "that the products listed on Exhibit B could not be sold to a customer in Exhibit A."

{¶24} Keith Massey testified that he is the president and owner of Trinity and has been since 2007. In May 2012, Massey signed the Agreement with Clifton, and on October 20, 2015, he terminated the Agreement. Massey testified that, since October 20, 2015, Trinity sold

railroad wear parts manufactured by companies other than Clifton to 13 customers listed on Exhibit A.  He also testified, however, that Trinity has "not sold one part of Clifton Steel's" since termination of the Agreement.

{¶25} According to Massey, when he signed the Agreement, he was not "provided" Exhibits A and B; rather, the exhibits "showed up at [his] attorney's [office] a day after termination of the agreement."  Massey described Exhibit A as "a railroad wish list that basically includes the entire rail industry."  Massey described Exhibit B as "an extensive list of wear plates, parts, that Clifton Steel had the potential to manufacture or sell."  Massey testified that, during the term of the Agreement, Trinity sold "[l]ess than 20" of these products manufactured by Clifton.

{¶26} Massey's understanding of the Termination Provision is that "Trinity Equipment cannot sell the parts or services of Clifton Steel to Clifton's customers" upon termination of the Agreement.  In his opinion, this is a "wholesale style clause," that should "prevent [Trinity] essentially from warehousing [Clifton's] products."  Put another way, Trinity's argument is that the Termination Provision prevented Trinity from being a secondary marketer or warehouser of Clifton's products for 12 months after the Agreement was terminated.  Asked if he thought that by signing the Agreement Trinity "would not be allowed to sell * * * products that are competitive to Clifton's products after terminating the agreement," Massey answered, "Absolutely not. * * * So during the term of the agreement, it was very clear that we could not sell competitive parts.  We agreed to that.  We did not do it."

{¶27} After the preliminary injunction hearing, the court found on the record that the "issue comes down to that interpretation of" the Termination Provision.  "And it's clear that there is a differing opinion about what it means, what the intent of that paragraph was. * * * It's

not clear what it means. The language is not clear." The court noted that Trinity argued that the language is plain, and the words "compete" or "competitive" are not there. Clifton, on the other hand, argued that the provision "has no meaning without the understanding that we believe the language conveys." The court found that "the evidence that's been presented thus far would tend to support [Clifton's] interpretation of what that language intended. It doesn't make sense any other way." The court found no evidence indicating that Clifton defaulted on the Agreement, because "performance issues" would be between Clifton and its buyers, not between Clifton and its selling agent, Trinity. Ultimately, the trial court found that the Termination Provision prohibited Trinity from selling parts listed on Exhibit B to customers listed on Exhibit A and granted the preliminary injunction.

{¶28} Upon review, we find that the language used in the termination provision is ambiguous, because it "is susceptible to two or more reasonable interpretations." Thus, we turn to the parties' intent. The title or heading of Section 5 of the Agreement is: "*Restriction* on other representation during the term of this agreement and *from competing on termination*." (Emphasis added.) Additionally, the parties' understanding of the scope of this restriction resulted in two different interpretations. Nonetheless, it is evident from the record that the parties necessarily contemplated some type of prohibition on competition upon termination of the Agreement.

{¶29} The trial court concluded that the restriction should be based on Exhibits A and B, which were referenced in the Agreement, but not specifically in the Termination Provision. Although Massey testified that Trinity was not "provided" these exhibits when he executed the Agreement, he was at least aware of their existence because they are referenced in the document he signed. "A party to a contract is responsible for reading what he signs." *Love v. Crestmont*

*Cadillac*, 8th Dist. Cuyahoga No. 104807, 2017-Ohio-1555, ¶ 15. Further, even if Massey did not receive the exhibits on the day that the parties executed the Agreement, there is no evidence that Massey subsequently objected to the exhibits upon receiving them.

{¶30} After review of the evidence, we agree with the trial court's interpretation of the Agreement. "The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing unfair competition." *Cynergies Consulting, Inc. v. Wheeler*, 8th Dist. Cuyahoga No. 90225, 2008-Ohio-3362, ¶ 18, quoting *Westco Group, Inc. v. City Mattress*, 2d Dist. Montgomery No. 12619, 1991 Ohio App. LEXIS 3878 (Aug. 15, 1991). "[T]he Supreme Court of Ohio 'has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions.'" *Id.* at ¶ 21, quoting *Land Lake Emp. Group of Akron v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27.

{¶31} The title of Section 5 as well as the reference to both Exhibits A and B in the Agreement lead us to conclude that the parties intended the Termination Provision to mean that Trinity could not sell any of the products listed on Exhibit B to any of the companies listed on Exhibit A for a period of one year following termination of the Agreement, which we find to be reasonable geographical and temporal restrictions.

{¶32} Accordingly, we overrule Trinity's first assignment of error.

**B. Preliminary Injunction**

{¶33} In its second assignment of error, Trinity argues that the trial court abused its discretion in granting Clifton's motion for a preliminary injunction.

{¶34} The primary goal of preliminary injunctive relief is to preserve the status quo pending final determination of the matter. *Mears v. Zeppe's Franchise Dev.*, 8th Dist. Cuyahoga

No. 90312, 2009-Ohio-27, ¶ 23. We review rulings on motions for preliminary injunctions for an abuse of discretion. *Crestmont Cadillac Corp. v. GMC*, 8th Dist. Cuyahoga No. 83000, 2004-Ohio-488, ¶ 26-27. Under this standard, we must defer to the trial court's factual findings and may only reverse the trial court's decision if it is unreasonable, arbitrary, or unconscionable. "Essentially, 'abuse of discretion' describes a judgment neither comporting with the record, nor reason." *In re S.E.*, 8th Dist. Cuyahoga No. 96031, 2011-Ohio-2042, ¶ 13, citing *In re Wiley*, 11th Dist. Lake No. 2007-P-0013, 2007-Ohio-7123.

**{¶35}** The party seeking a preliminary injunction must show, by clear and convincing evidence, the following:

- A substantial likelihood of success on the merits of the underlying claim;

- Irreparable harm will be suffered if the injunction is not granted;

- Issuing the injunction will not harm third parties; and

- The public interest would be served by issuing the injunction.

*KLN Logistics Corp. v. Norton*, 174 Ohio App.3d 712, 2008-Ohio-212, 884 N.E.2d 631, ¶ 12 (8th Dist.).

**{¶36}** In finding that Clifton "has demonstrated that it is likely to succeed on the merits of its claims," the court construed the Termination Provision to prohibit Trinity from selling any product on Exhibit B to any customer on Exhibit A. The trial court then found, by clear and convincing evidence, "that since terminating the Agreement on October 20, 2015, [Trinity] has improperly done business with" various Clifton customers.

**{¶37}** The court also found that, "by clear and convincing evidence [Clifton] has demonstrated that it will suffer irreparable injury if the injunctive relief is not granted." As to the final two prongs of the preliminary injunction test, the court found that Trinity "has not

demonstrated that it will suffer any undue hardship as a result of the enforcement of this Agreement, and the public interest weighs in favor of enforcing contractual obligations between the parties."

{¶38} After reviewing the record and the above-listed factors, we find that the court did not abuse its discretion in granting Clifton's motion for preliminary injunction.

{¶39} The record supports the trial court's finding related to the first factor considered for purposes of preliminary injunction, which is whether Clifton is likely to succeed on the merits. Here, Trinity terminated the Agreement and then immediately began doing business with at least 13 of the customers listed on Exhibit A in violation of the noncompete clause found in the Termination Provision.   As such, we find the record shows that Clifton was likely to succeed on its breach of contract claim for Trinity's alleged violation of the noncompete clause.

{¶40} As to the second factor, the record supports the trial court's finding that Clifton "demonstrated that it will suffer irreparable injury if the injunctive relief[,] [which requests the enforcement of the noncompete clause encompassing the companies listed in Exhibit A,] is not granted."   Clifton has a legitimate interest in protecting the long-standing relationships it had with its customers as well as those companies it tried to build relationships with through Trinity.  *See* Mielcusny, *Loosening the Rust Belt: Why Ohio Should Re-Examine Its Current Standard for Determining the Enforceability of Covenants Not to Compete Contained in Employment Agreements*, 63 Cleve.St.L.Rev. 707, 714 (2015) ("The unfair competition that an employer seeks to avoid through the use of a non-compete could also stem from a failure to protect particular assets, such as customer bases[.]").   Trinity was the sole and exclusive seller of Clifton's products for almost 30 years, had direct contact with all of Clifton's customers, and was essentially the "face" of Clifton's products.   As Clifton contends, enforcing the noncompete

clause would give Clifton time to assemble its own sales work force, introduce that work force to its customers, create a new "face" for its products, build more direct relationships with its customers, and take over all of the operations that Trinity performed for it. Further, Clifton established that it already suffered irreparable harm that could be contributed to Trinity's violation of the Agreement. Clifton's president testified that since the termination of the Agreement between Clifton and Trinity, Clifton's railroad wear parts business has decreased "over 50 percent," including significant decreases for Clifton's two biggest customers, and estimated that those lost sales cost Clifton "hundreds of thousands of dollars."

{¶41} The record also supports the trial court's finding that enforcing the noncompete clause as to all of the companies on Exhibit A — including those that were not customers of Clifton — is also necessary to protect Clifton's interests. The record supports a finding that Trinity signed the Agreement, which prohibited it from selling to all of the companies listed on Exhibit A, regardless of whether they were current customers of Clifton. As a result, any sales Trinity made to any of those companies would violate the Agreement's terms, and the record supports the trial court's finding that Trinity did violate the Agreement's terms.

{¶42} Turning to the third factor, the record supports the trial court's order finding that Trinity did not "demonstrate[] that it will suffer any undue hardship as a result of the enforcement of this Agreement [including Exhibit A]." The record shows that neither Trinity nor others would suffer undue hardship because the company sold products other than railroad wear parts and that Trinity would only have to lay off an employee or two if the trial court granted the injunction. Further, as the trial court aptly noted at the hearing, Trinity was aware of this potential harm when it "hedged" offers with outside companies and decided to terminate the Agreement with Clifton.

**{¶43}** Finally, as to the fourth factor, the record supports the trial court's finding that "the public interest weighs in favor of enforcing contractual obligations between the parties." "[P]ersons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *Nottingdale Homeowners' Assn. v. Darby*, 33 Ohio St.3d 32, 36, 514 N.E.2d 702 (1987). Further, "preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Century Business Servs., Inc. v. Urban*, 179 Ohio App.3d 111, 2008-Ohio-5744, 900 N.E.2d 1048, ¶ 17 (8th Dist.), citing *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 770 N.E.2d 1068 (10th Dist.2001).

**{¶44}** Here, the parties voluntarily entered into the written Agreement on May 4, 2012. The parties had been operating without a written Agreement from 1986 to 2012. The parties agreed that Trinity would not sell products from Exhibit B to customers listed on Exhibit A for the 12-month period following the termination of the Agreement. After Trinity voluntarily terminated the Agreement on October 20, 2015, it immediately began selling competitive products to Clifton customers despite the noncompete clause in the Agreement. Therefore, contrary to Trinity's argument, enforcing the Agreement between the parties would actually serve public interest.

**{¶45}** In conclusion, the record shows that the trial court's order granting the preliminary injunction and finding that the noncompete clause's scope encompasses all of the companies listed in Exhibit A is reasonable and is not an abuse of discretion. Accordingly, we overrule Trinity's second assignment of error.

### C. Motion to Dismiss

**{¶46}** In its third assignment of error, Trinity argues that the trial court erred in denying its motion to dismiss Count 1 of Clifton's complaint for breach of contract.

**{¶47}** Trinity filed a motion to dismiss Count 1 for breach of contract under Civ.R. 12(B)(6) for failure to state a claim upon which relief can be granted. Trinity's argument in support of dismissing this claim is the same argument it raises on appeal — that Trinity did not breach the plain reading of the Termination Provision. The court denied Trinity's motion to dismiss.

**{¶48}** "In general, a decision denying a motion to dismiss is not a final appealable order." *Shane v. Tracy*, 8th Dist. Cuyahoga No. 77025, 2000 Ohio App. LEXIS 3844 (Aug. 24, 2000). *See also* R.C. 2505.02. This court lacks subject matter jurisdiction to consider arguments relating to Trinity's third assigned error. Ohio Constitution, Article IV, Section 3(B)(2). Accordingly, we overrule Trinity's third assignment of error.

**{¶49}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, A.J., CONCURS;
PATRICIA ANN BLACKMON, J., CONCURS IN PART AND
DISSENTS IN PART (WITH SEPARATE OPINION).

PATRICIA ANN BLACKMON, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶50} While I agree with the majority's opinion that the trial court properly granted Clifton's motion for preliminary injunction, I would respectfully find that the majority's conclusion regarding the interpretation of the Termination Provision, and thus the scope of the noncompete clause, is unreasonable. Consequently, I respectfully dissent.

{¶51} To determine whether the trial court's interpretation of the Termination Provision is reasonable, we turn to the scope of the noncompete clause. In granting the preliminary injunction, the court did not consider any factors specific to a noncompete clause, which "is enforceable only to the extent it (1) is necessary to protect the company's legitimate interest; (2) does not impose undue hardship on the employee; and (3) is not adverse to public interest." *Jacono v. Invacare Corp.*, 8th Dist. Cuyahoga No. 86605, 2006-Ohio-1596, ¶ 31. In determining whether restrictions imposed by a noncompete clause are reasonable, courts should consider the following factors:

> the absence or presence of limitations as to time and space * * *[;] [w]hether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403, 406, 200 N.E.2d 297 (1964), *overruled in part on other grounds, Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975).

{¶52} According to the record, there is evidence of the following.

{¶53} First, the Termination Provision is limited to 12 months, and it appears to be unlimited geographically within the United States. Second, Trinity was the sole or exclusive contact with Clifton's customers. Third, testimony in the record shows that Clifton's parts were "standardized" products that did not involve confidential information or trade secrets. Fourth, the court's interpretation seeks to eliminate all competition in the railroad wear parts industry. Fifth, it is unclear from the record whether the Termination Provision "seeks to stifle" Trinity's skills, although it appears that Trinity sold products other than railroad wear parts. There is no evidence in the record as to what extent the remaining four factors apply to the case at hand. Although the numbers in the record were admittedly not accurate or complete, Thomas testified that Clifton lost at least $500,000 in sales after Trinity terminated the Agreement. Whether these lost sales can be attributed to Trinity's actions and the exact amount of damages, if any, are facts to be determined at a future time.

{¶54} I would find that the trial court's interpretation of the Termination Provision's restrictions is more encompassing than reasonably necessary to protect Clifton. Furthermore, in my opinion, the restrictions impose an undue hardship on Trinity who, under the injunction as granted, is prohibited from selling parts that Clifton has not manufactured in recent history to companies with which Clifton has never done business. *See Mid-West Presort Mailing Servs., Inc. v. Clark*, 9th Dist. Summit No. 13215, 1988 Ohio App. LEXIS 615 (Feb. 10, 1988) ("Employers should not receive insulation from all competition * * *; rather, they should only receive protection from unfair competition"). In other words, I would find that an umbrella prohibition on all competition within the railroad wear parts industry (i.e., incorporating Exhibits A and B) is unreasonable. Rather, I would narrow the scope of the noncompete clause to prohibit

Trinity from selling, for a 12-month period, any product it previously sold for Clifton to any customer to whom it previously sold to on behalf of Clifton during the term of the Agreement.